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, People of the State of Illinois, Defendant, Appellee. The order in this case is that all defendants are found. Everyone is on behalf of Mr. Parker, Defendant, and Mr. Appellee. Everyone is on behalf of the Defendant, Appellee, and Mr. Parker. Case 215-0709, People of the State of Illinois, Defendant, Appellee. The order in this case is that all defendants are found. Everyone is on behalf of Mr. Parker, Defendant, and Mr. Parker. Everyone is on behalf of the Defendant, Appellee, and Mr. Parker. Which one is going to argue first? Mrs. Gelman, you may proceed. Good morning, Your Honors. Good morning, Counsel. May it please the Court. I am Josette Gelman from the Office of the State Appellate Defender, appearing today on behalf of William Filioff, the Defendant, one of the Defendants. The Defendant in this case is appealing from convictions that were entered by a jury on one count of murder and two counts of attempt murder. These convictions were entered after a second jury trial was held, after this Court had initially, in the first direct appeal, remanded the cases of both Defendants for new trials. At the second jury trial, there were only two witnesses who identified William Filioff as one of the perpetrators. One of them was LeBron Graham, who testified at the first trial, but did not appear at the second trial, and so his prior testimony. He was declared unavailable. Correct. Which isn't quite the same thing, is it? Well, his testimony was admitted. But doesn't he have to be declared unavailable in order to allow evidence? Right, for this, for prior testimony. Whereas if it doesn't appear, it doesn't necessarily follow that things are admitted. Right, yes, and we're not contesting that he was unavailable. So his testimony essentially was presented through his prior first trial testimony. The other witness was Deshea Coleman-Rogers, who appeared at both trials and was a witness of somewhat dubious credibility at both trials. We're asking that this Court grant Mr. Filioff another trial, based on two errors that were committed by the trial court in this case, which relates to the credibility of these two key state witnesses. The first is that the trial court refused to allow the defense to impeach LeBron Graham's prior testimony with an affidavit in which he recanted his identification of Mr. Filioff as one of the offenders. And secondly, the court allowed the state to introduce prior consistent statements that Deshea had made to detectives, one of whom was a detective who had shown her the photographic line-up IDs at the time of the offense. These errors really go hand-in-hand because what happened was the state was, or the defense was prevented from attacking the credibility of one of the identifying witnesses. And at the same time, the state was allowed to bolster the credibility of the other identifying witness. With respect to the affidavit, what about the discrepancy regarding the date of the offense in the affidavit? Well, in order for, in order for, and first of all, I think under either rule, L.R. Rule of Evidence 806, or as a matter of constitutional law, this defendant was entitled to have that affidavit admitted. In order to have an affidavit admitted of, to attack the credibility of a declarant who's not in court, all you have to do is provide a rational basis to show that there's a, a rational basis to show that it is what it purports to be. The date, I mean, certainly Mr. Graham is not talking, I think it was a few weeks off. This is an affidavit that was signed about seven years after the offense. He listed the date of July 7th, I believe, and the actual date of the offense was the end of June. Certainly not an indication that he's talking about another shooting. He refers specifically to Mr. Philadelphia. Well, there's a, if you insert a period before the capital O, then you get a, a meaning that suggests that the date of 7-17 is the date that he conferred with the police department. It could be read that way, correct. Well, whether it should or not, the capitalization of the O would suggest that there should be a period in front of it. Yeah, I'm not sure actually in this handwriting whether it is capitalized or, I mean, there's no punctuation really in any of the affidavits. Your point is that from the contents you know he's talking about the same shooting. Correct. There's no dispute. Correct, right. And with respect to the proofs, it was a notary, and that's the job of a notary, to identify the person who's signing a document. Correct. To authenticate, correct. Correct. There is absolutely a rational basis in this case for finding that this was an affidavit that was signed by LeBron Graham. The notary, she's not only, I believe she said she's also a county clerk, although it isn't clear where she was a clerk. A courtroom clerk. A courtroom clerk. Okay, but yeah, it's not clear from the record where exactly she was employed. But she said it was her, basically her habit and practice, when she notarized a document, she would not notarize a document without seeing valid identification and without having the individual sign the document in front of her. If there's any discrepancies, that goes to the weight. Once there's a rational basis for finding that this document is what it purports to be, then the issue of whether it's authentic or not is a question for the trier of fact. Would you agree, though, that, I'm sorry, would you agree that had the state sought to challenge the authenticity of the document, they could have done so outside the presence of the jury at a hearing? Well, they somewhat did that. What did they do? Did they present evidence? They said what they did was they were trying to contest when the affidavit was delivered to defense counsel and by whom, which really doesn't go to whether it was signed or not. That's my point. The state had access, obviously, to the defendant's, or not to the defendant's, to Mr. Graham's signatures because he had been arrested numerous times, so they'd have his bond sheets that he signed and other documents in those various court files. They didn't present any evidence to challenge the authenticity of the signature? No, not that I recall, no, no. I think what was happening here was that the trial judge himself just didn't believe that this had been signed by LeBron Graham, that in his view it wasn't authentic, but that wasn't really his call to make. It was the jury's call to make whether it was authentic or not. And I would point out, too, in this case. Well, doesn't a court always have a threshold duty to determine whether something is admittable? Sure. The judge makes rulings on admissibility, but in this case it was erratic. You're saying that it was prima facie sufficient to be submitted to the jury for whatever purposes they wanted, and if the state wanted to contest the fact that this wasn't an affidavit executed by this individual, they could do so? The state could certainly point out the discrepancies in the affidavit to the jury. In fact, you know, it seems to me that that's really the only challenge they originally had. Whoever Mr. Graham was had a falsified ID? They could have. They presented it to the lower republic? Sure, they could have argued that. Yeah, but what they couldn't do was keep it out altogether because LeBron Graham, and I'm reading again the closing arguments of the prosecutor in this case, both the opening and closing argument and the rebuttal. The prosecutor made a big point about how LeBron Graham's prior testimony, that he had identified William Filio 30, 40, 50 times. I think he mentioned that at least three times during one of his closing arguments. And pressed the point that there was nothing to contradict Mr. Graham's identification of Mr. Filio. Well, this affidavit certainly would have done that. And the defense was deprived of any opportunity to challenge the credibility of the identification from the first trial. And also a case where it made a difference. That made a difference, as did allowing the corroboration of Deshaies' credibility. There was no physical evidence tying Mr. Filio to this case. The state conceded that there was no motive shown for why Mr. Filio would have committed this offense. I have to say, with respect to the state's response to this issue, first of all, the state concedes in its brief that this affidavit was impeaching. I don't see how it could be disputed that it's impeaching. But the state's response to whether it was admissible or not is really essentially a non-response. The state does not respond at all to the argument about that this was admissible under Illinois Rule of Evidence 806. And the state's position is that the foundation that was presented by the defense did not meet the requirements for admission of this affidavit as substantive evidence under 115.10.1 or 115.10.2 of the Code of Criminal Procedure. This was never being admitted for substantive purposes. The defense attorneys and the trial court repeatedly said we want to introduce this for impeachment purposes. So the state's argument is really irrelevant to the issue that we raised with respect to the affidavit. With respect to Deshea Coleman Rogers, the state was allowed to introduce snippets of an interview that two detectives had had with Deshea, actually during the middle of trial. And what those snippets did was not only bolster her credibility but the detective's credibility because they started out, this little snippet started out with Deshea saying, the truth is what I told you the first time. And the detective, I believe one of the detectives who had shown her the photographic lineup, said, and what is that, just so we can be 100 percent certain. And then she's allowed on the videotape to say that I saw these two men, that I was able to identify them, and then the officer said, and you identified them in the photo lineup immediately after this shooting. Is that correct? Yes, that's correct. Did we say anything to you to induce you? Did we pressure you? No, you didn't do anything wrong. The only purpose of that was to bolster the credibility of her identification of these two witnesses. The judge, in allowing this, said he was allowing it in as substantive evidence to perfect impeachment. I can't really say that I really understand what that really meant. It's the same, only different. Correct, yes. It certainly wasn't admissible as substantive evidence. Prior consistent statements are never admissible as substantive evidence. They're not even really, in terms of impeachment, it doesn't really make sense to say that this was admissible as impeachment, because it didn't impeach her. It bolstered her, corroborated her identifications. So it simply wasn't admissible as a prior consistent statement in the first place, which is permissible in some circumstances. But in this case, the defense was not alleging that she had recently fabricated her testimony. She had made identifications shortly after the crime occurred. They weren't alleging that she had a motive to fabricate. So there was no basis to admit this evidence. And, again, the State, in closing argument, used this evidence to suggest that she was telling the truth because the detectives talked to her in a secure environment. She felt safe. So you can, basically telling the jury, you can be sure that what she said to these detectives is true and that she was able to identify these men because she told them this and she told them that she properly identified them. The detectives themselves were able to get before the jury that they hadn't done anything improper. Didn't she testify that she saw, identified them despite the fact that they were wearing ski masks? She was not the witness who testified about the ski masks. That was actually another witness whose testimony was read at the second floor. What did she testify to? She testified that she was in a second-floor apartment looking down at the street, heard gunshots, that the area was dark. She said there was a light over the apartment building where two men ran out of, but that was contradicted by a police officer who actually took a video of the scene and that light was not on. So her claim was that she was looking down from the second floor at two men running out of a building in a dark area, but running for a matter of seconds and that based on that she was able to identify these two men. She did make some comments, though, that can be taken as the police directing her on who to pick. I mean, one of her comments was because he's the one I supposed to see with the handgun, quote. And then later in her testimony she said, how can I circle people's faces if I had not seen them, but they wanted me to do it so I had to do it? Well, I do want to clarify because for Deshaies, the direct – they had two separate juries in this case, and I don't recall if Mr. Filios was the green or the blue jury, but they have two separate juries. The direct examination of Deshaies took place jointly. The cross was done separately before separate juries. The instance where Deshaies said I circled the one I was supposed to related to Johnny Parker during cross examination by Mr. Filios' attorney. The other things were defense counsel for Mr. Parker did go on and on about did the police tell you anything and got many responses from her that might have intimated that the police were inducing it. But that didn't happen in Mr. Filios' cross examination. So there was even under those circumstances less reason for the state to be introducing this videotaped interview. And your argument is these prior consistent statements still would be inadmissible for rehabilitation. Right. Correct. Just one more question. Going back to the affidavit, to follow up on what Justice McClaren asked, doesn't the trial court in its gatekeeping function have a responsibility to look at the proposed evidence, whether or not that evidence is reliable? For example, the date of the notary is a different date than the date that the document was – At the top. Right. Correct? So that's one issue. And it was – I forget the exact number, but it was months later, correct? January, I have it here, January 23rd was written at the top and it was notarized on March 26th. So a couple of months past. So that's one issue. The other concern is there's no indication as to who was present when that document was prepared, whether or not there may have been a gun to Mr. Graham's head when he prepared that affidavit. I mean – Yeah, I would think the notary would remember that. But a judge – doesn't a judge in a gatekeeping function have a responsibility to ensure that there's at least some reliability, setting aside even the authentication of the document? Doesn't there also have to be some sort of inquiry by the trial court as to whether or not that's a reliable piece of evidence? Or is that solely for the jury? I believe more accurately it's for the jury because the inquiry here is not, is what's here true? The inquiry is, was this statement made? And – The inquiry is whether there's a rational basis upon which a fact finder may conclude the exhibit was made by Graham. Right. Correct. That's the inquiry of the trial court. And the defense was not and really could not use this as proof of the truth of it. All they could show was he's saying different things at different times. So reliability in that sense is not really at issue here. The only issue is, was there a sufficient basis for finding that this was what it purports to be? And there certainly was with the testimony of the notary. Your argument in a nutshell is that the affidavit was impeaching and should have been admitted into evidence for whatever weight the jury wanted to give it. Correct. Thank you. Thank you. Do you have an opportunity to make rebuttal? Thank you. Ms. Naval? Naval, yes. Good morning, Your Honor. Good morning, Your Honors. Good morning, counsel. May it please the Court, my name is Yasmin Naval and I represent Johnny Parker. I'm not going to be repeating the arguments that Ms. Galnick already made. I'm also going to be discussing the improper exclusion of LeBron Graham's affidavit, but I will not repeat those arguments regarding admissibility. Just to touch upon a few points, very briefly, I did indicate in my reply brief that that capital O is a relevant consideration and there's no punctuation in the affidavit. That capital O could be sort of another sentence. That day, 7-17, is quite distinct because that's the day that Graham was released from the hospital. So that may indicate where that day comes from. Also, the affidavit is... Is there any indication that the police spoke to him that day? The defense counsel made that representation, I believe, but I don't know that for a fact. But defense counsel certainly argued that at the hearing regarding its admission. And the affidavit and its claim regarding mistaken identification is actually more consistent with Graham's prior accounts. We have a man who identified prior to trial Earl Epps, a third offender, and then subsequently recanted that identification. So in a way, it is quite consistent with his accounts previously. Well, did he claim there were three people or did he just switch identities? No, he claimed there were three people. And then at a meeting and two separate, I believe, interrogate or discussions with police, he said it was Earl Epps was there too. And then disavowed it at a meeting where he discussed leniency on a pending escape case. Finally, he said Earl Epps was not there. I'm going to limit my discussion to prejudice as to moving on to prejudice with regards to Johnny Parker. It is true that the affidavit does only single out William Filia as the shooter. But this is a case in which both defendants were tried under an accountability theory. And the state made much of the close association between the two men, introduced a phone recording, a July 3, 2007 phone recording, where they discussed the case to establish a connection between these two men. So to the extent that the evidence absolved William Filia, it too was relevant to Parker. And Parker's jury equally had a right to hear this evidence. There's also an explanation for why the affidavit mentioned Filia alone. The state's theory was that William Filia was the individual who shot LeBron Graham and that Johnny Parker was the individual who shot Ernest Hughes. And the affidavit was given to defense counsel for William Filia. To answer some of your questions, Justice Burkett, about the affidavit, there wasn't any indication of when he signed it. Ms. Carbello had no recollection. But the evidence or the statement from Schwartzbach, Mr. Schwartzbach, is that the affidavit was delivered to him via Deontay White, a third party, and given to him by that. So that's... And the state attempted to speak to Mr. White, but he didn't show up? There was no indication that the state even sought out Deontay White. They didn't introduce anything at that hearing to suggest that this affidavit was anything other than it already was. I'd like to move on to the, of course, to the evidence of this case, which, again, it relates also to a reasonable doubt claim that I've made in the brief. But certainly it was a very weak case. I've argued it before, and I'll repeat that. Just to briefly, Justice Burke, you had asked a little bit about the testimony with Deshay. I'm going to start with her, because there is different testimony before my jury or Parker's jury. On direct examination before both juries, she testified that she could not really identify the men, only that one was tall, and one tall and carried a shotgun, and the other one was short and carried a handgun. She identified the person from photo array, People's Exhibit 254, because, quote, he's the one I supposed to see with the handgun. This was before both defendants' juries. Then Parker's jury was excused. The examination proceeded before Filia's jury, and when Parker's jury resumed, the defense asked, or the state asked to reopen the direct examination, because during redirect examination in front of Filia's jury, she had identified finally the two defendants as the individuals identified in People's Exhibits 254 and 53. So at that time, in response to leading questions, Rogers identifies Parker as the shorter man in People's Exhibit 254. Then again, on cross-examination, she says, no, she didn't see the two men's faces. On redirect examination, she flips once again, and she says the defendants were, again, the two men she saw fleeing from the apartment. Now, in redirecting Filia's case, that was the first time she made an in-court identification? Correct. Absolutely. But because the, yeah, the two juries were separate. On recross examination, she's confronted with her testimony from January 12, 2015, at the motion to suppress identification. And at that time, she says, all I can tell you is I seen skin. One was black and one was light-skinned. Then on re-redirect examination, and Justice Berkey alluded to this quote, which is quite important. She goes into a lengthy quote. First and foremost, I was taken to the station. My grandma came down there to get me from the station. My grandma asked the police to stop asking me questions because, first and foremost, they didn't have permission from her. I was a minor. So they came back to my mama's house, and they brought the lineup. Like I told them there at the station, how can I circle people's faces if I haven't seen them? But they wanted me to do it, so I did it. And I circled. They didn't tell me who to circle. I circled who I thought did it. I mean, that is an internally inconsistent statement altogether. And so the state tried to rehabilitate her with the January 13th videotape statement with those brief snippets, which came after the January 12th, the motion to suppress identification. But on balance, I mean, her testimony is all over the place. It led the court to candidly admit that she was a whimsical. So, and independently, we do know she has a lengthy psychiatric history. She was 16 at the time of the identifications, didn't have a guardian with her. So there's quite, and importantly, she claimed Parker was the shorter of the two men when, in fact, he's considerably taller than Mr. Filia. Yet a little, was alluded to earlier, testified that she didn't even see the individual's faces because they wore masks. That leaves LeBron Graham. He was the centerpiece of the state's case. And LeBron Graham knew both sons from the past, correct? Correct, correct. And he, while he's in the hospital, and maybe even beforehand, identifies Filia and Parker as two of the men, correct? He identifies him 16 hours later. So he is actually confronted with police. He doesn't tell them at that time who the offenders are. He does know them, but as people of the LRMA has taught us, even identifications of people you know can be problematic. In fact, you use your prior memory of them to recreate the scene. In this case. LRMA came out after this. Correct. I don't know if it came out after the trial. 2016. 2016, yes. So it may have been after this. But certainly the defense could have called or attempted to call an expert in eyewitness identification. Certainly. There was no attempt to do so. No, there wasn't. You're absolutely right. But, yeah, he was intoxicated at the time of the shooting. Then he says that they're unmasked, yet a little says they're masked. He's a repeat convicted felon. He was awaiting for transfer. And he disavowed one of his identifications at a meeting where he was discussing leniency with the state. That's with respect to EPS. And by that time. Yes. Parker and Filial were already in custody. Correct. EPS had not been arrested, correct? I don't, I'm not sure about EPS, actually. I'm not, I don't know if the record is quite clear about EPS's involvement. At the time that Graham identifies your client, the police didn't know that the cell phone that was recovered from the alley would come back to Parker, did they? They found that out later. I don't, yeah, that's potentially possible. I'm not certain on their investigation. The recovery of that phone would certainly corroborate Graham's identification. Not necessarily. Because Johnny Parker lived in the area as well. So it's really not that compelling of a fact in actuality when you consider how weak the evidence is. Still circumstantial evidence that he was in the area, correct? Yes, because he lived there. I mean, that's. Well, he lived blocks away. He lived a couple blocks away. Okay. That was, that was, but certainly that's the, even the circumstantial evidence in this case is relatively weak. The jacket actually is a subject of an ineffective assistance of counsel claim. Because there was testimony at the first trial that the jacket which Ms. Little attributed to defendant, there were store employees who testified. In actuality, that was a very common item at the time. And, in fact, Shea had two men dressed in black. And we have, then we have her, yet a little, saying no, one of them had a tan coat. These witnesses were all over the place. The jury had every right to hear this affidavit. And as Ms. Skelnick ably and aptly said, it was admissible. Those questions, which Your Honor has opposed, go to the reliability, go to reliability, which the state was certainly ready to dispute. The final case had been established for its admission. The phone call. Oh, thank you. Thank you. Yeah. It is true, would you agree, that the fact that Parker calls Filiad right after his bond hearing has a tendency to be circumstantial evidence of a connection. Would you agree? It shows that they knew each other. And it wouldn't be, it's not unsurprising that they would have. Actually, right after that phone call is when William Filiad was arrested by the police. They already had him in mind. So the bond hearing very likely discussed William Filiad. So it would be a natural connection. But, yes, that was, that's what makes this affidavit, even though it mentions only William Filiad by name, equally relevant to Parker, to Parker's case. And Parker's jury should have heard it as well. But other than that, the phone call in and of itself is not compelling evidence of guilt. That's where they learned most of the evidence. Thank you. State's arguments and repeated references to the $10 million bond. Yeah, that's highly inappropriate. I don't think the state makes any argument that that was improper. And, in fact, the court contemplated that having been excluded. I can understand why defense counsel maybe wanted the bond court reference there. But the $10 million bond in and of itself served no purpose. That could have been excluded. What it did is it highlighted for the jury that, oh, this guy must be a bad guy because he had a $10 million bond. I mean, this is a lay jury. And then the state hypes that up in closing arguments. That in and of itself is highly prejudicial. And, as I mentioned, I don't know why there was no stipulation as to the testimony at the first trial regarding the jacket. That was a key. With all these problematic eyewitness testimonies, occurrence witness testimony, it was important to rebut the importance or to basically attack that evidence of the jacket. If there are no further questions. Thank you. Thank you. We'll have an opportunity to make rebuttal. Ms. Kripke, you may proceed. Good morning, Jim Kripke. On behalf of the people of the State of Illinois Councils. In regard to the affidavit, I'll start with the affidavit. The affidavit says, I, LeBron Graham, write this affidavit to say that I never saw who shot me. And then you could add, on July 17th, 2007, regardless of whether that's a new sentence or not. I never saw who shot me. So if he never saw who shot me, then the rest, he said, I don't, then he didn't see. It could have been Filia if he never saw the person. But doesn't this contradict his testimony that he not only saw who shot him, but identifies Filia? Yes. And so it's not impeaching. They're trying to bring that in. How is it not impeaching? If I say, well, on one day, I saw who shot me, and it was Filia. And then the next day I say, I never saw who shot me. Because it's coming in the substance of evidence. What would be impeaching would be, I couldn't see, I don't think I saw, like what do you do with your left? I don't think I saw correctly. I didn't have my glasses on. I'm not sure who was there. But he's just saying, I never saw anybody. I don't know who the person was. So it's not impeaching of anything. What it is, is he's trying to bring it in. Doesn't it impeach him when he says he saw somebody who did it without naming them? What if he said, I saw the person, but I don't know who that person was. And then later on said, on second thought, I never saw who shot me. Wouldn't that be impeaching? I think it comes in for substantive evidence to say, on the one hand, this is what they want to say. Because 10 times at trial, he testified Filia was the one who shot him. I'm sorry, but I interrupt because I don't understand why you mentioned substantive when I thought this was being admitted as impeachment. Oh, they said it was. They said it was substantive? No, they said it was impeaching. But I think they were trying to bring it in for the purposes of substantive. You disagree with that? I disagree with it because there's no argument. They never argued. They were never permitted to argue because the trial court excluded it. Let's talk about authenticity first. You're dropping the gun. You're right. You are correct. So let's talk about the reliability of this or why. Authentication. Excuse me? Authentication. Well, the authentication was that the notary said, I don't remember anything. I don't remember who was there. She never testifies as if there was a witness to this. Counsel just said that she didn't see Filia sign it. Do you have a case that suggests that the fact that a notary cannot recall the date or cannot recall the person or can't recall the exact circumstances under which he or she notarized the document is grounds to exclude the document when it's notarized? Do I have a case? Do you have such a case? No, I don't. But I think that under 901, if I had the case, I think I would have. I don't know. Under the Supreme Court history, the Supreme Court, the appellate courts, notarized documents are routinely received in divorce cases, adoption proceedings, wills and estates, contract cases, and murder cases. But there must be some underlying premise of a foundation. This is a piece of paper that comes in and has one date. It's notarized two months later and shows up at Filia's attorney's offices three months later. And they don't even know who brought it. They think maybe Deontay White brought it. We know nothing about Deontay White. For all we know, as Justice McLaren suggested, Deontay White might have gone with a fake ID and signed it in front of her. We simply don't know. This has no resemblance to a business document where we know it's an ongoing enterprise. The documents are kept in the routine way the business is ongoing. You seem to be arguing the reliability of this document. I am, I am, I am. Which again is a trustworthiness issue and a hearsay and all that. But are we conflating things? I mean, are we to look at reliability when we're looking at this? Or are we to look at simply authentication and then argue reliability to the fact finder? The authentication, I mean, the cases under 901, before 901 was even adopted in the Illinois Rules of Evidence, under the common law, rational basis. Is there a rational basis upon which a fact finder may conclude that LeBron Graham broke this affidavit? Is there a rational basis for it? The only one that fits under the 901 rules is testimony of a witness with knowledge. A testimony that a matter is what it is claimed to be. She never, all she did was say, I notarized this document. She never said she read it. She never said she knew what it was. She said that she always checked the IDs and she would never notarize a document without showing a proper identification, photograph ID. And that is the job of a notary. Under the notary statute, a notary's public function, and there's a presumption that attaches to any public official, is to serve as an unprejudiced witness. That's the function of a notary. I understand that. But the judge also is allowed to make, it's the discretion of the judge of whether or not the document comes in. So there's a balancing that's going on. On the one hand, he's looking at a notary who comes in and testifies. We're not disputing that her note, that she didn't, how can I dispute it? I can't dispute, the only thing I can dispute is that she said, I looked at an ID and I saw somebody sign it. She never said they matched. She never said the ID was current. She just said it's a valid ID. I don't know what a valid ID even means. There was no questions about it. So let's, assuming our UNO, that her notarization is appropriate, the judge then has to look at the document. And the document and the basis, the rational basis for this document does not comport with the notarization. We have no testimony of what went on at that notarization event. Well, she testified to what her practice is. Correct. That she would never notarize a document unless she confirmed that the person signing the document is that person that's in the IDs, correct? That's what she said, but she never said, but she didn't say that it was, she didn't say that the ID had the appropriate date on it. We'll go back to another point. I'm talking about. I understand what you're saying. The reliability issue as to whether or not it was actually Mr. Graham who signed that document. The state had access to Graham's signatures. We know that because he had an extensive criminal history. He had been locked up several times. You had access, the state had access to his signature. If there was going to be a challenge to the reliability of that document, it could have been submitted to a document examiner to determine whether or not he in fact signed that document. Correct? It could have been. Could have been. But that's not what the reliability. Well, you're talking about reliability. I'm asking you about reliability. What did the state offer to contest the reliability of that signature? Nothing. Okay. Of the signature. These are the facts that I have. I know those are the facts you have. You're stuck with them. I am stuck with them. And they're compelling with respect. You even acknowledge that this is a provision that applies. And I don't want to. I agree. But I also will say, I will argue again, that this is an abuse of discretion standard on whether or not this evidence could come in. And for the court, for the court that's looking at something that's two months from the date at the top of the document to when it was received by the attorney, there are five months. Isn't that an argument to be made to the jury regarding the weight of the document and not its admissibility? I think it can go to both. I think the judge has to be the gatekeeper. Do you have a case that says that? Because all the cases that I've read say authenticity is a different question than reliability. But we're talking about reliability. Reliability is for the fact finder, not for the trial court. But the trial court also has to look at the reliability of this document. And you're saying the only thing that can make it reliable. No, I'm asking the question. The question is what does the state present to undermine the reliability of the document? They didn't. Okay. They questioned Janice Caraballo. But the court has the ability to use its discretion to look at what's going on here. And, yes, I agree that one gets a certification, the notarization lends a certain aura of reliability or whatever word we want, authenticity to it. However, the court is also able to look at this and to make a decision. You know, we're talking about reliability. But my question, looking at the trial court's ruling on this issue, is whether the trial court abused its discretion in not even looking at reliability. Certainly not looking at a rational basis, but not even looking at reliability in weighing this document. I mean, some of the comments the court made may relate to relevance of the document. And then the court ends its comments by saying, should Mr. Graham suddenly reappear, cross-examination based upon this document wouldn't lead to any type of fruitful result for the defense. I mean, in your opinion, did the trial court overstep its bounds in a 901 analysis by making these comments? I'm not exactly sure what the court was talking about when he said some of those things. I mean, to me, they're almost not – they don't make sense. But I'm making the argument – this is the argument I am making. I know, but they don't make a lot of sense to me either based on 901. So my question is, did the trial court abuse its discretion in not following the correct standard when it actually looked at this document? Put another way, is there anything in the record that would indicate that the judge said something that would properly rationalize his decision to not admit the affidavit? No. Not that I recall. Not that I recall. I mean, this was a very – I mean, it was a perfunctory, for me, very frustrating scenario that went on. However, even if this court finds that it was an abuse of the court's discretion, we would argue that it was harmless error that this went in, because you had LeBron Graham's testimony where he said 10 times that he was certain of who had shot him. And then there's other – I mean, I would disagree with – first of all, we also had – I want to go through some of the other comments that were made about some of the facts and evidence. Justice McClernand, you asked about ski masks. No one testified about ski masks, but I think yet a little said that they were – She said they had masks below their eyes. And whether it was a mask or part of a hood. I said a ski mask. Excuse me? I said a ski mask. Correct, but that's not – no one testified that they were – they might have asked, but the testimony was that the mask went up to the nose, like that type of thing. The other thing was having to do with the brown sweater. Was it ineffective assistance of counsel not to bring in, what, seven or eight years later, two kids who worked at some stores to testify that this was a common sweater or sweater jacket? I don't think it's ineffective assistance of counsel. There was nothing that was pursued about it. No one raised it anywhere to say that this was ineffective assistance of counsel. Perhaps these people couldn't even have been reached at that point. But the fact of the matter is that yet a little said that he wore a brown sweater or jacket. And LeBron Graham also said it was a brown jacket with lines on it. I don't know if that means stripes or whatever. And when they went to pick up Parker at his house, boom, he walks out of the house wearing this very garment. Which is inconsistent with Rogers' testimony. Correct. So – Correct. But, again, I don't have a – unfortunately, in the record, we don't have – it's part of the evidence. We don't have the sweater and we don't have a picture of the sweater. So I don't know how dark it was. And, again, it was at night. Now, that also goes to her ability to recognize the people. There was inconsistent testimony with when that light was on, too. There was inconsistent testimony. But I went through that. I can't remember which brief. I went through it thoroughly about the testimony. But it might have been in the Parker one. In that, there were two police officers, the ones who responded almost immediately. They both testified that there was a light on over the awning. The picture that was shot like an hour or so later by the videographer didn't have the light on. And Deshae Rogers testified that the light went on intermittently. It went on and off. And she said – she always said that there was a light on over the awning. What she said was there wasn't a street light on, whereas the police officer said there was a street light on. But it was – again, the testimony – excuse me. The testimony was confusing, and I was trying to identify it in the pictures. And I don't recall trying – if I ever saw the street light anywhere. But the officer who found the cell phone said he saw it down the alley, and there was adequate lighting for him to be able to see that. As to Deshae Rogers and the statement that was admitted, I think what the judge said was the best. It was – I mean, politely put, her testimony was whimsical. She was all over the place. And she contradicted herself. We would maintain that that statement does come in, the videotape statement that she gave to Jim Verduca, because she testified on direct that she could identify it, but then she was crossed that she couldn't. And they brought that in. You could say it was recent fabrication. I would say also it was brought in to rehabilitate her. I mean, her testimony was just all over the place. And it can come in for rehabilitation purposes. Again, whether or not it would have made a difference, there were actually three juries now that convicted these people, and they sorted through the testimony. Whether or not adding in this other snippet had much bearing, given the fact that her testimony was so erratic, it's hard to tell. But I think that it had a de minimis effect. I can't imagine that the jury was – the juries were able to sort through all of this and say, oh, well, that's the turning point. You know, this is absolutely – this is what puts the nail in the cotton, this little snippet of videotape. With respect to – going back to Mr. Graham and the affidavit. Yes. The defense ultimately did not challenge the finding of unavailability, correct? That's correct. However, I was curious. Do you know why the state resisted defense counsel's request to question the detectives who were waiting around to find out what efforts they had made to find Graham? I – you know, I really – but it was in there. They had that – The trial court would not allow them to question the detectives. You know, I really – Defense counsel had the detectives waiting in the hallway. They were under subpoena. They requested to examine the detectives. The trial court wouldn't let them do it. I don't know why. Do you know why? I have no idea why. They just relied upon the affidavits of the efforts they took to find Graham. Well, it wasn't the affidavits. It was the state's attorney who went through and – Well, they prepared a statement of what efforts they took. But it was pretty – I mean, it was very detailed. I mean, he gave the dates. I think I put the dates in one of the briefs or both of the briefs. I mean, they were constantly trying to get a hold of the broader – I remember a case I tried. We found the witness in Guatemala the day before we picked the jury. They couldn't find Graham in North Chicago. Maybe he was in Guatemala. Maybe he was. But he didn't live there. Put that North Guatemala thing. North Guatemala. I have a question. Yes. Ms. Duval said that her client was prejudiced because the affidavit would have an effect on her client's culpability based upon accountability. And if this were to be reversed and remanded for a new trial, do you think that the state would attempt to establish guilt through accountability? You're asking me to project that you're going to reverse? Well, I'm setting you up for a trick question.  Can I pass on the trick question? I will do it in a slightly different way. Let's assume that upon retrial, the state, again, attempts to claim that Parker's accountable for filial. And since Graham's affidavit relates to filial, if filial didn't do it, then how can the state establish accountability on Parker based upon the fact that filial didn't do it? Which means that for purposes of admissibility of the affidavit, shouldn't Parker's jury be allowed to hear or see, consider the affidavit by Mr. Graham relative to filial for purposes of determining whether or not Parker was guilty through accountability? Through filial. Presuming that you remand saying you have to admit this... Affidavit. Does it go to both juries or just to one jury? Point being, if supposedly Mr. Parker's being charged with accountability, then why wouldn't the affidavit also apply in his case? It could. Ms. Skellick, to follow up on that, Ms. Skellick indicated that you conceded that this evidence was admissible, and I don't know if that's true or not. I would ask if you agree with that concession, and would that apply to both cases? Are you talking about this? The affidavit. That it was admissible? I conceded that? That might have been a second thought. Maybe I'll retract that. I think that... I don't know how to answer that. I really don't. I would have to think that through, and I wouldn't want to commit the State to anything. We, of course, are arguing that you shouldn't send this back. Hold on. I know, and I'm talking about what happened before. I'm talking about whether or not it was admissible in both cases. I mean, clearly, if it's admissible in... Let's just assume it's... There's a rational basis to say that Graham made this, and clearly, then, that would be admissible under 806 in Filiard's case. Okay. My question to you, then, would it... You mean in Parker's case? No, in Filiard's case. Oh, in Filiard, yeah, okay. Would you agree that based upon the way this trial took place, both trials, really, but certainly the second trial, that it would also be admissible in Parker's case, or would have been admissible in Parker's case? Because of the... Because of the... Because it's... Because of the accountability. The way the State tried the case. I mean, the State, you know, putting the telephone call in between the two of them, trying to link the two of them together at every turn. I mean... Well, I think that if you're going... I think that the two are definitely intertwined. It's not only the telephone call between the two of them. It's the telephone call between Filiard and Peterson, where they're talking about, you know, about Deshae Rogers and her testimony and why we couldn't get her to flip. And her testimony, therefore, applies to both of them. And she also was saying that they were both doing... She saw two men. She identified both men. They're intertwined. That's the best, you know, I'm going to say on that. I mean, I just don't know what to say on that. And also, you don't know if they'll be able to... I think I was just told that Mr. Filiard was in jail again, so maybe he is... I mean, Mr. Graham might be in jail, so he might actually be accessible at some point. But, again, we would conclude by saying that we believe that the defendants were proven guilty beyond reasonable doubt, that there was enough circumstantial evidence to link them, certainly to link Parker to the crime, and certainly to link Filiard to the crime, if you're looking at them together. I think the arguments that Filiard was fed information by his family members is completely unsupported by the record. The state, when the phone was recovered, that was tied to Parker later, after Graham identified him, correct? No, I don't know about... It's interesting, because I don't think that... I'm not sure about that, because the phone... What they said about the phone call, or the phone, was that there were phone calls going on up to, like, a minute or two before everybody testified there was this break-in. The next phone call came from the police at 9.30 in the morning. And so it's unclear what they would do if they had identified, at that time, who the phone belonged to. There was no testimony about that. Where that fit in in the scale of the 16 hours later for Filiard and Parker, I don't know. Excuse me. The whole... There are gaps in what happened in terms of the evidence, in terms of the timeline between the phone calls. Well, one was the search of Parker's residence when the box was recovered for the phone. Pardon me? When was the search of Parker's residence? I was just thinking about that. It had to have been later. I honestly don't remember. And then when they also picked up Parker at that point. I just have one quick question. Yes. You talk about this prior consistent statements that come in for general rehabilitative purposes. Do you have a case that says that? No. Generally, prior consistent statements come in to rebut recent fabrication. They did not do that below, did they? No, they didn't. It's just I'm not really sure if it should have come in for prior inconsistent statements or if it's to rehabilitate on a consistent statement because she just kept flipping her testimony all along. Whether it was an abuse of discretion to admit it, I would again argue that it would have de minimis effect given how many times she testified, how many times she went back and forth. The other thing we're not seeing here is her general demeanor and how she testified. And apparently she must have appeared credible. This is like three juries now that have heard her. And especially in the second go around, the state made a great effort to keep this young woman on her medication, to keep her focused. We're not saying that they were pushing her to testify in a certain way, but to keep her mentally stable to be able to come in and recite the testimony as she recalled it. And I think that that's something we can't, especially the court can't forget that we're not hearing this, we're not seeing this, we're not hearing the tone, but two different juries heard that, and both of them convicted these two men independently, based not only on her testimony, but the testimony that was read in by now Judge Matthews, I believe, Reggie Matthews, and also the testimony of yet a little that had enough compelling evidence. And the other thing that I can say about LeBron Graham not identifying anybody until later, that's sort of putting it in a dying declaration type of mode, and he wasn't dying, he wanted medical help. And there's no case law or anything that puts an obligation on someone who's been gravely wounded in a shooting to tell the EMTs or whoever who shot the person. Could you address the ineffective assistance claim regarding Harper that the state's argument, that repeatedly referring to the $10 million bond, there should have been an objection? There should have been, there could have been, but then the whole thing got, apparently it didn't bother, I forgot the name of the defense counsel, and that's because then he actually broke in to the state's closing and referenced the bond himself. So it sort of goes against, and apparently that was something that didn't bother him as much. My point is that it should have bothered any judge who was ruling on that objection, especially when a judge had ordered it. There was no objection. That's my point, the failure to object. You just acknowledged that it shouldn't have been argued. There was no objection, so. But also, look, here's a man who's charged with the murder of one person and attempt murder of two other people and spraying an apartment with guns. I don't think a jury would be so swayed, oh, my God, it's $10 million, he must be guilty. How about the fact that what he was charged with would probably, I mean, maybe a jury would think, well, that's what I would expect the type of bond would be for someone who's charged with these type of crimes. It was only argued for the purpose of inflaming the jury. What other purpose was there? I don't know if it inflames the jury. My question is, arguments that are intended solely to inflame the jury are improper. That $10 million bond had absolutely no relevance to this case. Did it? It shouldn't have come in. But I don't think that it's anything that one can say if there was any kind of ineffective assistance of counsel that was rendered in regard to that information coming out is not something that I think tilted the scale in this case because I think there was other evidence. What about human error, especially in light of the weakness of the identifications? I don't think the identifications were weak. I think they were. I think filial was definite. Did you read the first opinion of this court? I did. But this court also said at the end, look, there was circumstantial evidence, there were all these other things, and we're not saying otherwise. If this court had felt that it was sufficiently or insufficient, insufficient evidence, you would have reversed outright, and you didn't. And so, and it's the same, basically the same evidence that came forth later. Thank you. Ms. Spellman. You may proceed. Thank you. Just three points. Justice Burke, with respect to the comments about the State's concession, the State conceded in its brief, not that the affidavit was admissible, but that it was impeaching. And I would just read from page 6 of the State's brief where Ms. Kripke says, Here, defendant moved to admit a notarized document allegedly written and signed by LeBron Graham, contradicting and therefore impeaching his 2009 trial testimony. And that's our point, that the defense was trying to admit it for impeaching purposes. The State has acknowledged that it was impeaching, and I guess... There are no admissible evidence. And the State was arguing something that wasn't admissible substantive evidence. With respect to the notary, the State is questioning... When she said she always asks for a valid ID, she always requires that the person sign in front of her. Well, what do we know what she means by a valid ID? I would point out, the notary was present in court, was questioned by the trial judge, was questioned by defense counsel. The State's attorney never even took an opportunity to question her. They could have said, What do you mean by a valid ID? They didn't. She performed her job in accordance with the Notary Public Act, and they never questioned her practices. Finally, the State says that the failure to admit LeBron Graham's affidavit was harmless because we have LeBron Graham's testimony stating 10 times that Filio was the person who shot him. That's exactly why omitting, excluding this affidavit was not harmless because the defense had no opportunity to tell the jury that he directly contradicted his identification of Filio. And for all the reasons we've argued, we would ask that the defendant be granted a new trial. Thank you. Thank you. Ms. Navarro, you may proceed. Thank you. Just a few points from me as well. Very briefly, this is not an abuse of discretion standard. We're dealing with a confrontation violation and the right to present a defense. Harmless beyond a reasonable doubt standard applies, not just the regular harmless error standard. But really, we're supposed to look at the statutory violations or alleged violations first and then not get to the constitutional context. Correct. Under EH, you get to the non-constitutional issues. We're just looking at 806 and 901. We're looking at an abuse of discretion, correct? Yes, but it does amount to under the Sixth Circuit case, actually, that the state forfeited any response to, the Blackstone case is a confrontation clause. All of those, actually, those rules of evidence that you're talking about, they model the federal rules as well, and that's an important point, and the Michigan rules. But, yes, it would ultimately, whether they were admissible under them and whether that constituted a denial of the right to confront and to present a defense, which we argue that he did. Justice Burkett, to answer your question, Ms. Kripke was talking about phone calls. I think her recollection of those phone calls is completely inaccurate from my recollection of the case. The search of the home, of Johnny Parker's home, I believe happened very soon after his arrest, which was, I think, right after the crime on June 29th, thereafter. So, in point of fact, when the police did speak to Graham, they did actually have some person in mind, based on that phone call. That, in and of itself, would lessen the persuasive value of the phone as well. So, just to clarify that. And, again, Ms. Kripke makes a similar argument that she made in her briefs about double jeopardy. So, basically, pointing to this court's ruling and remanding for a new trial based on double jeopardy purposes, these were two different trials. At the first trial, there was highly prejudicial evidence against Mr. Parker, an inculpatory statement allegedly made by Mr. Filia, which was introduced in front of a single jury, and the defense wasn't allowed to probe the significant psychiatric problems that Ms. Rogers had. Under a people-be-givens, the Illinois Supreme Court is held. You can't just reverse when a reasonable doubt claim isn't before the court. So, that has no bearing. There's no further questions? Okay, thank you. I take the case under advisement. Court is adjourned.